## HALE v. GENERAL MOTORS CORPORATION.
### Civil Action No. 1938.

District Court, D. Massachusetts.
June 11, 1943.

Ezekiel Wolf and Hector M. Holmes, both of Boston, Mass., for plaintiff.

Richard F. Walker and Roberts, Cushman & Woodberry, all of Boston, Mass., and C. B. Townsend, Drury W. Cooper, and Cooper, Kerr & Dunham, all of New York City, for defendant.

### Findings of Fact.

WYZANSKI, District Judge.

1. Plaintiff, Jesse W. Hale, is a resident of Weston, Massachusetts. Defendant, General Motors Corporation, is a Delaware corporation.

2. The complaint charged infringement of two patents, Nos. 2,140,155 and 2,186,334, each issued to and owned by the plaintiff. At the commencement of the trial, plaintiff announced a dismissal as to Patent No. 2,-140,155. Judgment for the defendant on that patent was duly entered, on consent, at the conclusion of the trial. That judgment dismissed the complaint on the merits and with prejudice, as regards Patent No. 2,-140,155, with costs to the defendant to be taxed as regards the cause of action on that patent.

3. The action was tried as to Patent No. 2,186,334 only. Claims 2 and 34, formerly charged by plaintiff, in his bill of particulars, to be infringed, were dropped by plaintiff at the commencement of the trial. The claims remaining in suit were Nos. 16, 19, 21, 23, 24 and 36.

4. The patent relates to a purported improvement in "change speed systems" or "change speed devices", ordinarily known as "transmissions", such as are common on automobiles and for other uses. Such devices are very old in automobiles, where they have been used almost from the beginning. Automatic and semi-automatic transmissions employing a governor or "speed-responsive device" for effecting some part of the operation are at least as old as about 1907–1908. They were the subject of investigation and research work conducted by the defendant beginning at least as early as the 1920's; and form the subject of a continuous line of research, engineering and development work by the defendant, unbroken from 1928 to the present time, and of which the accused device is the most recent result.

5. In the fifth paragraph of the specification of the patent in suit it is stated:

"One of the improvements to be noted at the outset in my present invention is that the governor effects gear shifting and is itself dominated, for example, by fluid pressure or vacuum, whereas in prior units the governor dominated the fluid or electric controls which effected change in the gear ratio."

It is a correct statement of the Hale disclosure, as embodied in both drawings and specification, "that the governor [in Hale] effects gear shifting and is itself dominated, for example, by fluid pressure * * *". This is shown in Fig. 1 of Hale's patent drawings (of which a copy is appended), where the governor comprises weights $W$ mounted on the governor arms 30, pivoted at the point $30^c$ and so arranged that it "effects gear shifting" by direct mechanical action of the governor arms $30^b$ in pressing upon the pressure plate 32 to effect the gear shifts. The latter are accomplished by first moving the entire assembly to the left in order to engage the clutch 21, 22, shown in the upper and lower left hand corners of Fig. 1, thus effecting the gear shift from first to second speed; and thereafter moving the plate 32 still farther to the left to effect engagement of the clutch 38, 39, shown at the middle of Fig. 1, and thereby effecting gear shift second to high speed. All this is accomplished without the interposition of any elements between

the governor arms 30[b] and the plate 32 upon which they exert their direct mechanical action. It is the action which is referred to and described in the claims in suit, e. g. in the following language of claim 16: "a speed governor effecting ratio changes", and in the similar language of claim 19: "a speed governor effecting gear ratio changes."

6. The manner in which the governor purports to be "itself dominated * * * by fluid pressure * * * as set forth in the fifth paragraph of the specification, is shown in Fig. 7 of the Hale patent (of which a copy is appended). Fig. 8 of the patent, which is a vacuum system, was disclaimed by the plaintiff so far as this action is concerned, and can be disregarded in this action (Tr. p. 54).

7. The control arrangement shown in Fig. 7 of the patent is one in which either the accelerator pedal, through the plunger 59, or the brake pedal 56, is described as acting, the former for acceleration and the latter for deceleration, through a mechanical linkage upon a valve 52. The opening of the valve 52 by depression of either accelerator or brake admits oil pressure to the right of piston 43, forcing it with its attached rack bar 26' and rack 26 to the left; while release of either accelerator or brake pedal closes valve 52, thus venting oil through pipes 50 and 48 from the right hand side of piston 43 and permitting retraction of rack 26 by means of spring 41.

8. The parts shown in Fig. 7 are arranged at right angles to the parts shown in Fig. 1, Fig. 7 being a sectional view taken of the line 7–7 of Fig. 1. Thus movement of the rack 26, whether by accelerator or brake, in the manner just described, rotates gear 25, Fig. 7. This gear is also shown, in cross-section, at the extreme right of Fig. 1. Such rotation of gear 25, counter-clockwise by fluid pressure applied to piston 43 and clockwise by retraction of spring 41, has as its only direct effect the movement to the left or right, as the case may be, (see Fig. 1) of the nut 24 which is mounted by a screw thread upon the part 23, Fig. 1. The result of all the foregoing, and the object of the entire linkage and control system described, is to compress or relax the spring 27 (Fig. 1), which in turn presses on the collar 31 and through it directly and mechanically dominates the governor W by pressing the collar 31 against the governor arms 30[a].

9. The effect of the entire control system and accelerator-brake linkage just described is simply to retard or delay the action of the governor in effecting gear shifting, when oil pressure is admitted to the right of piston 43 by depression of either accelerator pedal or brake pedal, and thus cause the gear shifting to occur at higher speeds than it normally would in the absence of pressure on accelerator or brake; and upon release of accelerator or brake pedal, by venting oil and retraction of piston 43 by spring 41, again to permit the governor to "effect gear shifting" at lower speeds in the normal manner.

10. The single transmission which the plaintiff did build and operate experimentally was not substantially identical with that disclosed in the patent in suit. It was in fact covered by a different patent of the plaintiff (Tr. p. 57), and did not contain the governor or controls of the patent in suit, or anything shown in Fig. 7 of the patent or to the right of the element 32 in Fig. 1 of the patent (Tr. p. 56).

11. Defendant's accused construction is known as the "Hydra-Matic" transmission, and was used on both Oldsmobile and Cadillac automobiles until automobile production was terminated on account of the war. It is the result of a continuous and successful course of engineering and research development and commercial application, commenced by the defendant at least as early as 1927–1928, carried on continuously by the defendant since that time, and in part represented by three prior art patents owned by the defendant and included in Defendant's Exhibit F: to wit, the Thompson Patent No. 2,285,760, filed March 6, 1933, the Tenney et al. Patent No. 1,783,931, filed May 31, 1929, and the Vetter Patent No. 1,984,556, filed November 9, 1932.

12. The construction of the Hydra-Matic transmission is shown in the large colored drawing furnished by defendant, Plaintiff's Exhibit 1, and of which a small copy is appended. The control system therefor is shown in the large colored control diagram also furnished by the defendant, Plaintiff's Exhibit 2, of which a copy is appended. The physical device is shown in Defendant's Exhibits A, B, C and M, the parts of the control apparatus, constituting the latter exhibit, also being shown in the photograph, Defendant's Ex-

hibit D, where they are lettered and otherwise identified.

13. As shown on Plaintiff's Exhibit 1, the transmission itself comprises, so far as material here, two planetary gear units of which the front unit is shown at the left of the casing and the rear unit at the right of the casing in Exhibit 1. These units have different ratios of reduction so that, by their proper actuation, four forward speeds may be produced, to wit: low speed when both units are in reduction in series; second speed when only the rear unit is in reduction and the front unit is in direct drive; third speed when the front unit is returned to reduction and the rear unit is placed in direct drive; and fourth speed or direct drive when both units are in direct.

Physically placed in front of both units, and shown at the left of Plaintiff's Exhibit 1, is a "fluid coupling" device which is operatively connected, as regards flow of power, between the front and rear units. This comprises a green "impeller" or turbo member and an orange drive member or "runner".

The operation of the two planetary units is by means of a brake and a clutch associated with each. Since both are planetary gearing units, it is an inherent characteristic of each that if any two of its members are locked together (by the clutch) the whole unit will rotate together and give direct drive. On the other hand, if no two of the members of the planetary unit are interlocked, and one of them is held against motion (by a brake), the unit will drive in reduction.

In the front planetary unit, the drive from the engine is by the red member to the external ring gear, through the blue planetary pinion, to the green carrier connected to the driving member of the fluid coupling. When the brake of this unit, which is applied to the white brake drum attached to the sun gear, is applied, the unit drives in reduction; when its brake is released and the green clutch is engaged, the green carrier is locked to the white sun gear and there is direct drive. The driven member of the fluid coupling (orange) is attached to the orange main shaft, which carries the sun gear of the rear unit. The latter drives through the blue pinions of the rear unit, which are mounted on the yellow carrier attached to the output shaft at the right. When the brake of this unit is applied, it drives in reduction, and when the brake is released and its clutch is engaged, the rear unit is put in direct drive.

The brakes and clutches of the two units are applied or disengaged, as appropriate, by means of fluid "servos", one for each unit, and suitably arranged to perform the necessary transitions between clutch engagement and brake release, and brake application with clutch release, to perform the up-and-down shifts already described. The foregoing is shown on Plaintiff's Exhibit 1.

A "servo" is merely a form of small motor, using fluid pressure or the like, for applying outside power as a substitute for a manual operation. Such servos have been commonly used for years, whenever more power was wanted than could be conviently supplied by hand, e.g. in steering steamboats, in air brakes on trains, and in numerous applications on automobiles, trucks and busses.

14. Plaintiff's Exhibit 2 shows the governor (at the upper right of the Exhibit) and the control valves, shifter valves and other valves, with accompanying piping, whereby the structure of Exhibit 1 is controlled and operated in the desired manner.

Beginning with the governor: This is made in two parts, viz., a low-speed governor having the larger weight and shown at the right, and a high-speed governor with a smaller weight and shown at the left, the whole being encircled on Plaintiff's Exhibit 2 and marked "Governor". There are no springs in or acting upon defendant's governor, and its function and operation are, for all practical purposes, and over the entire range of designed operation, independent of the apparatus to which the governor is connected, at a distance of several inches, by three pipes.

The governor itself is driven from the output shaft of the transmission, and thus begins to rotate about an axis perpendicular to the plane of the drawing, Plaintiff's Exhibit 2, as soon as the rear wheels of the automobile begin to move. Elsewhere in the transmission there are two oil pumps, one of which is driven by the engine, and the other by the output shaft of the transmission. The result is that as soon as either the engine or the rear wheels begin to rotate, an oil pressure of approximately 80 pounds is supplied for operation of the apparatus. This pressure is fed in at the point marked "Oil Pump

Inlet" on Plaintiff's Exhibit 2, and one branch of this supply goes through the green manual valve, shown at the top on the left of Exhibit 2, to the governor. The 80 pound oil supply to the governor is metered or reduced by the sliding action of the governor valve, where the reduced pressure is balanced against the centrifugal force exerted by the governor weights. The result is that the pressure is reduced and metered out by the governor in proportion to the speed of the automobile. This reduced or metered pressure delivered by the governor is supplied through two oil lines, one from the low-speed governor and the other from the high-speed governor, to the valve control body. It is dependent upon nothing but the speed of the car and, throughout the entire designed range of operation, is unaffected by the position or action of the shifter valves or other elements of the system.

There is no reaction upon the governor by the shifter valves or throttle valve (to be described later) and, so long as the automobile is in motion, the governor continues to perform its metering function without domination by any part of the system and without being affected by the other controls.

In this respect the defendant's construction, both as to the governor and other control elements, is like the prior units described, and disclaimed by the plaintiff, in the fifth paragraph of the specification in the following words: "whereas in prior units the governor dominated the fluid * * * controls which effected change in the gear ratio." Defendant's device is unlike what is stated, in that paragraph of the specification, to represent the plaintiff's patented invention, namely "that the governor effects gear shifting and is itself dominated * * * by fluid pressure * * *."

15. The metered pressure derived from the governor in defendant's device is supplied, through the two oil pipes already described, to the three governor plugs shown in blue at the lower right of Plaintiff's Exhibit 2 and is also applied directly to the three shifter valves shown in red in the central part of the right-hand section of Exhibit 2. This variable oil pressure derived from the governor in accord with the speed of the automobile, is opposed and, in general, balanced against, a variable oil pressure which is applied to the three yellow "regulator plugs" shown at the left of the right-hand portion of Exhibit 2. This pressure is conducted to the regulator plugs, through the second pipe from the bottom of Exhibit 2, from the yellow valve shown in the center of the left-hand portion of Exhibit 2, and designated "Throttle Valve". The latter is connected mechanically to the throttle lever which is actuated by the accelerator pedal and serves to meter oil pressure (also from the 80 pound source) in accord with the accelerator position. This metered oil pressure, thus varying in amount according to the position of the accelerator pedal and thus applied to the yellow regulator plugs, is accordingly balanced against the governor pressure applied to the governor plugs and shifter valves. The net result is that the metered governor pressure tends to move the three shifter valves toward the left; the metered throttle pressure tends to move the three shifter valves toward the right; and the shifter valves are themselves biased in their right-hand (closed) position, as shown on Exhibit 2, by means of graduated springs applied to the shifter valves and appearing between those valves and the regulator plugs on Exhibit 2. These shifter valve springs are successively graduated in such manner that the lightest tension is applied, by a single spring, to the 1–2 shifter valve. The next greater tension is applied, by two concentric springs, to the 2–3 shifter valve; and the greatest tension is applied, but not by contact with the 3–4 regulator plug, by a heavy spring to the 3–4 shifter valve.

16. The result of the foregoing is that, as the car increases speed and the governor pressure thus rises, a point is reached at which the governor pressure overcomes the metered throttle pressure applied to the 1–2 shifter valve and thereupon suddenly forces that valve completely to the left (open) position, without moving the other shifter valves at all. This sudden and complete opening of the 1–2 shifter valve then permits 80 pound oil pressure from the oil port marked "Oil Pump Inlet" to flow through appropriate pipes, as shown on the Exhibit, to the servo operating the brake and clutch to accomplish the 1–2 shift. As the governor pressure rises further due to increased speed of the car, it reaches a point at which it overcomes the increased throttle pressure ap-

plied to the 2–3 regulator plug, the car now moving faster, a point is reached at which the 2–3 shifter valve is similarly operated suddenly to a completely open position, thus applying the 80 pound pressure to the appropriate servos to actuate brakes and clutches for accomplishing the 2–3 shift. At a still higher speed of the car, a similar action occurs, moving the 3–4 shifter valve and accomplishing that shift. In slowing down the car, the same operations take place in the reverse order, to effect down shifts at appropriate speeds.

17. The foregoing elements, their principles of operation, and their manner of operation, are different from the elements, principles of operation and manner of operation disclosed in the patent in suit. As to each of the elements of each of the claims in suit, there is nothing in the defendant's apparatus which can be interchanged with the elements shown and described in the Hale patent. The specific devices and elements described in and covered by the patent in suit could not be used in the defendant's combination nor could the defendant's elements be interchanged with or used in the disclosure of the patent. The defendant does not accomplish its result by substantially the same or similar means to those disclosed in the Hale patent, nor is the same principle or same mode of operation employed by the defendant as that disclosed in Hale.

### Conclusions of Law.

1. The patent due to its lack of commercial use is entitled only to a narrow construction. This is reinforced by the fact that the patentee was a late-comer in a crowded art and the patent made no practical contribution to the art's advancement.

2. Non-infringement is established by the non-interchangeability and non-equivalence of the elements of the defendant's construction and of the patent in suit. Defendant's construction does not utilize anything in the Hale disclosure.

3. By the terms of his claims the patentee excluded the defendant's accused device.

4. The defendant's Hydra-Matic transmission embodies entirely different means from those of the patent, operating in a substantially different manner, and accomplishing a different result. There is therefore no infringement. The principle of operation employed in defendant's device is that disclaimed by the plaintiff in the fifth paragraph of his specification.

5. None of the claims in suit of the single patent remaining in the action are infringed by the defendant's Hydra-Matic transmission or its controls.

6. The complaint must be dismissed on the merits, as to the single remaining patent in suit, No. 2,186,334, with costs to the defendant to be taxed as regards the cause of action on that patent.

NOTE BY COURT: Copies of Exhibits marked Plaintiff's Exhibit 1, Plaintiff's Exhibit 2, Figure 1, Hale Patent No. 2,186,334 and Figure 7, Hale Patent No. 2,186,334 referred to in the foregoing Findings of Fact, as annexed, are here in this copy omitted.